

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-18-00122-CV

P.F. AND WIFE, J.F., AS NEXT                                              APPELLANTS
FRIENDS OF THEIR DAUGHTER
I.F.

V.

S.S., S.S., AND S.S.                                                        APPELLEES

----------

FROM THE 442ND DISTRICT COURT OF DENTON COUNTY
TRIAL COURT NO. 16-03909-442

----------

## MEMORANDUM OPINION[1]

----------

In this appeal, we are asked to determine if the trial court erred in entering a final summary judgment denying P.F. and his wife, J.F, as next friends of their daughter, I.F., recovery against the defendants S.S., S.S., and S.S.  We affirm in part and reverse in part.

---

[1]See Tex. R. App. P. 47.4.

### *Background*

Given the repetitiveness of the defendants' initials, we will call the three defendants by the following pseudonyms, Dad, Junior, and Debbie. In turn, P.F., J.F., and I.F., collectively will be referred to as Irsia, the pseudonym we assign to the daughter. The suit arose from sexual assaults committed by A.V. (pseudonym Alvin), I.G. (pseudonym Ivan), and J.A. (pseudonym Joe). Irsia was the victim of the assault, and it occurred at a party hosted by Junior and supervised by Debbie. As evidenced by the record before us, Irsia and Junior were 9th graders while Debbie was an 11th grader.

Junior and Debbie were the children of Dad, who had left for the weekend to attend Family Day at the college attended by his eldest daughter. No evidence of record indicates that Dad either knew of or consented to the party before it transpired. However, the record contains evidence indicating that Dad forbade his children from having guests over while he was gone. Ignoring this directive, Junior decided to host a small gathering of his fellow freshmen with the anticipation that they bring alcoholic beverages. Among those invited were Alvin, Irsia, a female friend of Irsia we will call Annette, and several boys. Ivan and Joe also attended.

Like her father, Debbie knew not of the party either but learned about it when her brother's friends appeared at her doorstep. Rather than stop the gathering and heed her father's earlier directive, she opted to supervise the event.

As expected, various of Junior's friends brought alcoholic beverages with them. Others brought marijuana. Junior and the other freshmen, including Irsia,

2

began to partake of those substances. The number of attendees grew and soon encompassed twenty to thirty males and four females. The females consisted of Irsia, Annette, Debbie, and a friend of Debbie's (i.e., May) who came to help at the behest of Debbie.

In time, Irsia became extremely intoxicated, as did other of the 9th graders. Debbie knew this and began taking some of the children home while May remained behind to oversee the others. While Debbie was gone, Irsia exited the house, stumbling as she did. Alvin followed. Whether he too was drunk is unclear. Nevertheless, the pair were in the front or side yard of the abode when Alvin began kissing Irsia. Soon thereafter, Irsia found herself on the ground with Alvin grasping her head and attempting to engage her in oral sex. Ivan appeared at the scene and briefly conversed with Alvin. Unsure of what happened, Irsia felt her pants being removed. At that point, Alvin had intercourse with the intoxicated Irsia while Ivan may have engaged in either intercourse or oral sex with her.[2] After Alvin and Ivan finished, Joe encountered Irsia on the ground and admitted to having her perform oral sex on him.

Apparently, May knew of what was occurring outside while Debbie was gone. This led her to phone Debbie and inform her that Irsia and Joe were having

---

[2]Evidence of record indicates that Alvin later bragged at school about his activity with Irsia.

intercourse in the front yard. Rather than intercede, May simply locked the front door of the house.

Alvin's conduct with Irsia on the lawn was not his first sexual encounter at the party. Earlier that evening, he was the recipient of oral sex performed upon him by Annette in a bathroom. The record indicates that Junior and Irsia stumbled upon the two in the bathroom. Yet, they were not the only ones who knew of this episode. Most, if not all, of the other attendees had knowledge of it. Indeed, many stood outside the bathroom door and laughed at what was happening. So too did Debbie discover the activity. Not only did she deem it "disgusting" but also told Alvin and Annette to exit the bathroom. When the couple failed to comply, Debbie simply walked away. Annette and others in attendance later joked about her actions.

The events of the night resulted in Irsia (via her parents) suing Dad, Debbie, and Junior for negligence and negligence per se.[3] Dad, Debbie, and Junior filed both a traditional and no-evidence motion for summary judgment after answering the petition. Both the traditional and no-evidence aspects of their motion were founded upon similar grounds. Through those grounds, Dad, Debbie, and Junior focused on the existence of a duty to act with care and on causation. Regarding the former, they urged that they had no legal duty to act for two reasons. First,

---

[3]Other causes of action were alleged, but they are not the subject of this appeal; that is, Irsia did not appeal their rejection by the trial court.

they were social hosts who, under Texas law, could not be held liable for the conduct of those to whom they provided alcohol or made it accessible, including minors. Second, they lacked any special relationship with Alvin, Ivan, and Joe, and absent such a relationship, they had no duty to control Alvin, Ivan, and Joe.

Regarding the topic of causation, they focused their argument on the alleged presence of a superseding cause, the latter being the criminal conduct of Alvin, Ivan, and Joe. Because they could prove the existence of such superseding conduct, Irsia allegedly had no evidence establishing a causal link between their purported negligence and her injuries.

In granting the motion for summary judgment, the trial court did not specify any particular ground it thought determinative. It simply denied Irsia recovery against her opponents. The decision spawned this appeal and its issues concerning whether the trial court erred in granting summary judgment on any of the grounds alleged.

### Discussion

Given that this is an appeal from a final summary judgment, we apply the standards of review recently described by the supreme court in *Dallas Morning News, Inc. v. Tatum*, No. 16-0098, 2018 WL 2182625, at *4 (Tex. May 11, 2018) and this court in *Nationwide Property & Casualty Insurance Co. v. Revive Mfg., LLC*, No. 02-17-00148-CV, 2018 WL 2248667, at *2 (Tex. App.—Fort Worth May 17, 2018, no pet.) (mem. op.). The parties are referred to those cases for a discussion of the standards.

5

### *Social Host and Right to Control*

As previously mentioned, summary judgment was sought on the grounds of no duty and superseding cause. Regarding the former, Dad, Debbie, and Junior posited that the duty was nonexistent because "Texas Courts have repeatedly held that there is no duty for social hosts absent a special relationship, and there are no exceptions to the insulation from liability of social hosts when they do not fall into the special relationship category." So too was it argued that "absent a special relationship, the defendants did not owe the plaintiffs a legal duty to control or prevent the tortious acts of another."

Whether a legal duty exists is a question of law for the court to decide from the facts surrounding the occurrence at issue. *Haji v. Valentine Enters., Inc.,* No. 02-13-00066-CV, 2014 WL 1257275, at *4 (Tex. App.—Fort Worth Mar. 27, 2014, no pet.) (mem. op.). Being a question of law, a reviewing court need not defer to the trial court's decision on the matter.

The supreme court has refused to impose liability upon social hosts who provide alcohol to others resulting in injury to the person who consumed the alcohol or to third parties. *Graff v. Beard*, 858 S.W.2d 918, 921–22 (Tex. 1993); *see Hernandez v. Gonzalez-Flores*, 530 S.W.3d 253, 259 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (holding that "[t]o the extent Hernandez is arguing that the ongoing activity was Gonzalez-Flores's hosting of a party at which he permitted guests to drink and use a gun, Gonzalez-Flores had no duty to Hernandez as a social host to prevent a guest from injuring her"); *Gatten v.*

6

*McCarley*, 391 S.W.3d 669, 675 (Tex. App.—Dallas 2013, no pet.) (stating that "Appellant does not cite any authority establishing a legal duty by social hosts to control their guests and prevent them from inflicting injury on other guests," and that "Texas courts have declined to impose such a duty on social hosts"). This rule against holding social hosts responsible includes the provision of alcohol to those under eighteen years of age. *Reeder v. Daniel*, 61 S.W.3d 359, 364–65 (Tex. 2001).

The supreme court has also held that there is no general duty to control others, though a special relationship may sometimes create a duty to aid or protect others. *Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 504 (Tex. 2017); *see Mendoza v. La. Stone, LLC*, No. 07-15-00133-CV, 2015 WL 9473932, at *2 (Tex. App.—Amarillo Dec. 22, 2015, pet. denied) (mem. op.) (holding the same); *Gatten*, 391 S.W.3d at 674 (holding the same). Examples of such relationships include employer/employee, parent/child, and independent contractor/contractee. *Mendoza*, 2015 WL 9473932, at *2; *Gatten*, 391 S.W.3d at 674. It is through the special relationships that one may gain or have foisted upon him the right or duty to control another. *Gatten*, 391 S.W.3d at 674; *see Carter v. Abbyad*, 299 S.W.3d 892, 901 (Tex. App.—Austin 2009, no pet.) (observing that the relationships that form an exception to the general rule of no duty "all involve situations where the defendant either had a recognized legal obligation to control the other person's conduct or the right to do so"). If such a relationship exists, then the party in control of another may owe a duty of care to persons foreseeably exposed to danger

7

arising from the defendant's failure to reasonably exercise that control. *Gatten*, 391 S.W.3d at 674.

Yet, special relationships are not the sole means of creating a right of or duty to control. It also may arise from the actual exercise of control over another. *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 292 (Tex. 2004); *Bell v. VPSI, Inc.*, 205 S.W.3d 706, 719–20 (Tex. App.—Fort Worth 2006, no pet.). Indeed, one voluntarily entering an affirmative course of action affecting the interests of another is regarded as assuming a duty to act and must do so with reasonable care. *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983); *accord Newsom v. B.B.*, 306 S.W.3d 910, 914 (Tex. App.—Beaumont 2010, pet. denied) (stating the same). For instance, though an employer owes no duty to protect the public from the bad acts of an off-duty employee committed off the worksite, such a duty does arise when the employer actually exercises control over the employee's off-duty activities that cause harm. *Loram Maint. of Way, Inc. v. Ianni*, 210 S.W.3d 593, 594 (Tex. 2006). In other words, exercising control creates a duty of care, and the duty is commensurate with the control retained. *Lee Lewis Constr. Co. v. Harrison*, 70 S.W.3d 778, 783 (Tex. 2001); *Mendoza*, 2015 WL 9473932, at *3.[4]

---

[4]To the extent that Dad, Debbie, and Junior suggest that Irsia failed to plead a cause of action involving the assumption of control, we say the following. Dad, Debbie, and Junior interjected the issue into the fray when attempting to disprove that they had either a duty or right to control the conduct of third parties. Furthermore, in her reply to the motion for summary judgment, Irsia often mentioned Debbie's decision to supervise the party, that is, assume control over those in attendance. So too did she 1) assert that "[a]lthough one does not generally have the duty to control another person or to aid a person in distress,

8

Assuming arguendo that Dad, Debbie, or Junior made alcohol accessible, they would have no duty to control the kids who consumed the substance or protect them or third parties from injury caused by such consumption, per the holdings in *Graff*, *Reeder*, and their progeny. Furthermore, no evidence of record indicates that Dad and his children had an employment, family, contractor, or similar relationship with Alvin, Ivan, Joe, or Irsia; so, it cannot be said that the former had the common type of special relationship with the latter that would create a duty of care.

Yet, evidence of record reveals that Debbie agreed to remain home the night of the party to supervise the activities of those present. She admitted as much and eschewed contacting Dad about the gathering because she considered herself mature enough to watch over those present. Having assumed the role of supervisor or chaperone, she "was kind of just like monitoring" things. As she would later explain, though, "when it started getting crazy, that's when I was like okay, I need to call [May] and – 'cause I can't watch all these people by myself. It's getting out of control." So she contacted May and asked for her help. May soon arrived with her boyfriend to assist Debbie. Eventually, Debbie sought to control the growing swell of attendees by locking the front door and having

one who chooses to exercise that control or provide the aid must do so responsibly and not make the circumstances worse," and 2) attempt to illustrate how Dad, Debbie, and Junior assumed control over those present. So, the assumption of control over the affair and those in attendance and the consequence of same were not foreign topics.

9

whomever appeared contact her and ask for permission to enter. She also regulated the boisterousness of the attendees and their use of marijuana. They were told by her that they needed to smoke the substance "outside and make sure they cleaned up from [sic] themselves" so her father would not discover evidence of the activity.

The sexual conduct of those present was another area in which Debbie interceded. She apparently knew that attendees would engage in same as evinced by a statement in her subsequent affidavit to the police. In it, she "explained" that "at parties people hook up." The attendees at Junior's party apparently did just that, and it involved more than promiscuity. Again, the ratio of males to females was anywhere from five or ten to one, depending upon whether the two chaperones (Debbie and May) were excluded. Of the two freshman girls present, one (Irsia) was discovered on a couch with a boy, and they were "getting kind of inappropriate," as characterized by Debbie. This led her to tell the 9th graders to "break it up." Other evidence of record could lead one to reasonably deduce that Irsia was drunk by the time she joined the boy on the couch.

The remaining freshman female (Annette) also was found engaging in inappropriate activities. They involved her performing oral sex in a bathroom on one of the boys (Alvin) who would eventually accost Irsia in the front yard. Debbie found the action "disgusting" and told the couple to leave the bathroom. They did not comply, and Debbie simply walked away.

10

Authority obligates us to construe the summary judgment record in a light most favorable to the nonmovant. *Nationwide*, 2018 WL 2248667, at *2. Upon our doing so, it can be said that a rational fact-finder could reasonably interpret the foregoing evidence as both intent and effort on the part of Debbie to exercise control over those at the party. Such a fact-finder could also reasonably infer that the activities being subjected to control included not only the attendees' conduct in general but also their engagement in matters of sex. So, while it may be that Dad, Debbie, or Junior had neither the right nor duty to control the minors at the party under the social host doctrine, a question of fact exists as to whether the chaperone of the event voluntarily entered into an affirmative course of action affecting the interests of another thereby creating a duty for her to act with reasonable care. In other words, a fact question exists as to whether Debbie exercised actual control over the attendees and their conduct (both general and sexual in nature) so as to impose on her a duty to protect the attendees and others from the foreseeable consequences of their actions, which included sexual activity.

Another matter touching upon the presence of duty bears attention. Irsia has repeatedly urged that "[t]his is not a social host case, but rather *a dangerous environment case*." [Emphasis added.] That is, Dad, Debbie, and Junior "together acted to create *a dangerous environment* populated by unsupervised teenagers, drugs, alcohol, and known predators." [Emphasis added.] "*[T]he environment created* by [them] . . . breached the Appellees' common law duty to take affirmative actions to make safe or avoid further increasing this *danger of*

11

***their own creation*.**" [Emphasis added.] Their "concerted negligent actions created ***a dangerous condition*** that ultimately was the proximate cause of the injuries to" Irsia. [Emphasis added.] Furthermore, these assertions echo allegations expressed in the original petition. For instance, we encounter averments about Dad, Debbie, and Junior 1) having "a duty to ***provide a safe environment*** for guests attending the party," and 2) "collectively breach[ing] the duty owed to [Irsia] . . . as a guest attending the party, ***to provide a safe environment*.**" [Emphasis added.] This thread of argument was continued within her response to the summary judgment motion. There too did she posit that Dad, Debbie, and Junior "***created a dangerous condition*** in their home" and "owed [her] a duty to prevent injury to her and others that it [sic] reasonably appeared or should have reasonably appeared in the exercise of their lawful rights others . . . may be ***injured by the dangerous condition*** that was created." [Emphasis added.]

Simply put, one can reasonably interpret Irsia's contentions as implicating a cause of action that actually does impose a duty to act. A duty arises when one creates a dangerous situation; should he or she do that, the person then has the duty to attempt to prevent injury to others "if it reasonably appears or should appear that others in the exercise of their lawful rights may be injured thereby." *Gatten*, 391 S.W.3d at 675–76; *see Buchanan v. Rose*, 159 S.W.2d 109, 110 (Tex. 1942) (stating that when a party negligently creates a dangerous situation it then becomes his duty to do something about it to prevent injury to others if it reasonably

12

appears or should appear to him that others in the exercise of their lawful rights may be injured by the situation); *see also SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 360 (Tex. 1995) (stating that "[o]nly where the party created the dangerous situation or where the party enjoys a special relationship with the other party giving rise to a duty will this general rule not apply," the general rule being that a mere bystander who did not create the dangerous situation had no duty to prevent injury to others). So, irrespective of the contention that social hosts owe no duty to others or that her opponents had no duty or right to control others, Irsia alleged a cause of action recognized in Texas as imposing a duty to act. More importantly, Dad, Debbie, and Junior did not request summary judgment on that particular cause of action via the traditional aspect of their summary judgment motion. To the extent that the no evidence aspect of their motion may have touched upon the claim, it merely concerns whether the superseding criminal conduct of Alvin, Ivan, and Joe broke the requisite causative link. We deal with the latter below.

In sum, Dad, Debbie, and Junior did not establish, as a matter of law, that their purported status as social hosts or the lack of any duty to control third parties entitled them to summary judgment. Thus, the trial court could not have legitimately granted them relief on those grounds.

### Proximate and Superseding Cause

We now turn to the remaining basis for summary judgment relief mentioned in the motion. As previously mentioned, it involves causation and whether

13

superseding criminal conduct broke the requisite causative link. Dad, Debbie, and Junior alleged in their motion that Irsia's purported "damages were the result of the criminal, intentional, negligent, unforeseeable acts of Defendants [Alvin, Ivan, and Joe] and were not proximately caused by Defendants [Dad, Debbie, and Junior]." That is, their "third party criminal conduct [was] a superseding cause and negate[d] proximate cause."

Normally, a third party's criminal conduct is a superseding cause of injury arising from a defendant's negligence. *Pichardo v. Big Diamond, Inc.*, 215 S.W.3d 497, 501 (Tex. App.—Fort Worth 2007, no pet.). The same is true even though a defendant's conduct created a situation which afforded an opportunity to the third party to commit the tort or crime. *Phan Son Van v. Pena*, 990 S.W.2d 751, 753–54 (Tex. 1999). Yet, this is not so if, at the time, the defendant realized or should have realized the likelihood that a situation affording a third party the opportunity to commit a tort or crime "might be created" and a third person might avail himself of the opportunity to commit the tort or crime. *Id.*; *Pichardo*, 215 S.W.3d at 501 (stating that a third party's criminal conduct is a superseding cause unless the criminal conduct was a foreseeable result of the defendant's negligence).

Furthermore, a defendant seeking summary judgment on the ground that he negated foreseeability as an element of proximate cause must prove more than simply that the intervening third party criminal conduct occurred. *Pichardo*, 215 S.W.3d at 501. The movant must establish that the third party criminal conduct rose to the level of a superseding cause based on various non-exclusive

14

indicia. *Id.* Those indicia include: 1) whether the intervening force brought about harm different in kind from that which would otherwise have resulted from the actor's negligence; 2) whether the intervening force's operation or the consequences of it appeared extraordinary rather than normal in view of the circumstances existing at the time; 3) whether the intervening force operated independently of any situation created by the actor's negligence or was a normal result of such a situation; 4) whether the operation of the intervening force was due to a third person's act or failure to act; 5) whether the intervening force was due to an act of a third person which is wrongful toward the other and, as such, subjects the third person to liability; and 6) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion. *Id.* Should the movant satisfy his burden, then the obligation falls upon the plaintiff to create a material issue of fact by presenting evidence that, "despite the extraordinary and abnormal nature of the intervening force, there was some indication at the time that such a crime would be committed." *Id.* at 501–02.

That Alvin, Ivan, and Joe engaged in oral or vaginal sex with Irsia without her consent are the purported superseding criminal events. They occurred several hours into the party. Yet, by that time, Debbie, the chaperone: 1) knew the ratio of boys to girls had grown anywhere from 5-to-1 to 10-to-1; 2) knew the attendees were 9th graders approximately fourteen to fifteen years old; 3) knew Irsia was highly intoxicated; 4) knew many other attendees were quite intoxicated; 5) knew Irsia had been "on the couch with one of the boys, and [she] had to like -- it was

getting kind of inappropriate, so [she] was like, okay, y'all need to break it up";

6) knew "at parties people hook up"; 7) knew that things "started getting crazy";

8) knew (as did Junior) one of the few females at the party had engaged in oral

sex in a bathroom with Alvin; 9) knew everyone at the party was laughing at what

occurred in the bathroom between Annette and Alvin; 10) knew that the attendees

viewed the engagement in such sexual activity with minimal seriousness or

nonchalance; and 11) knew that by 9:30 p.m. everyone was becoming too drunk

to control themselves. When becoming too drunk to control themselves, several

of the kids were taken home by Debbie, and it was then that Alvin, Ivan, and Joe

struck.

There is evidence of record also disclosing that Junior 1) believed Irsia was

drunk soon after arriving at the party, if not when she arrived; 2) witnessed Irsia's

intoxication progress to the point where she was stumbling; 3) considered the

event as getting out of control; 4) knew of the oral sex occurring in the bathroom;

5) knew the attendees were laughing about it; 6) thought everyone was just having

fun; 7) would have "kicked everybody out" if he was not himself drunk; 8) witnessed

Irsia becoming "flirtatious"; 9) saw her becoming "really touchy, just as girls are

when they're drunk"; 10) saw Irsia and Annette sitting on boys' laps and hugging

them; and 11) believed Irsia became so drunk that she would not have been able

to consent to sex.

The crime of sexual assault occurs in numerous ways. Though consent, or

the lack thereof, is often an element of the offense, it need not be if the victim is a

16

child. *See, e.g.*, Tex. Penal Code Ann. § 22.011(a)(2)(A) (West Supp. 2017) (making it a crime to intentionally or knowingly cause the penetration of a sexual organ of a child by any means); *Smallwood v. State*, 471 S.W.3d 601, 607 (Tex. App.—Fort Worth 2015, pet. ref'd) (op. on reh'g) (stating that a child cannot consent to sexual contact or intercourse and that compulsion is not an element required to be proved in the aggravated sexual assault or sexual assault of a child). And, a "child" is anyone younger than seventeen. Tex. Penal Code Ann. § 22.011(c)(1).

Moreover, penetrating a child's sexual organ, *id.* § 22.011(a)(2)(A), or penetrating a child's mouth with a sexual organ, *id.* § 22.011(a)(2)(B), fall within the scope of sexual assault. Given this, the factual nature of the conduct transpiring at the party, in the bathroom, and involving a fourteen- or fifteen-year-old female child likened to factual conduct deemed criminal under state law. Again, being a child, Annette could not have consented to the activity. *Smallwood*, 471 S.W.3d at 607. And, most importantly, Debbie, the chaperone, knew of its occurrence before leaving the house to take home several drunk children. She also knew of the general attitude of the attendees towards the sexual act and the inappropriate behavior between Irsia and a boy on the couch.

Viewing the events in reverse, a fact-finder reasonably could analogize them to a snowball rolling down a hill. Things began with drinking and ingesting drugs, grew to inappropriate sexual activity on a couch, soon became oral sex in a bathroom, and culminated in rape outside. Though Debbie tried to intervene when

17

the snowball grew to oral sex in the bathroom with a child, she ultimately "walked away" as everyone else laughed. Junior would have "kicked everyone out" if he was not so drunk and, therefore, thought people were just having fun. And, if the fact-finder so viewed the developing events, it also would have evidence before it to support a reasonable inference that 1) the sexual assaults committed by Alvin, Ivan, and Joe were not necessarily different in kind from that which would otherwise have resulted from failing to stop earlier sexual conduct; 2) their sexual assaults were not extraordinary given the circumstances existing at the time; 3) their sexual assaults were not necessarily independent of the relatively lax attitude toward "hooking-up" between drunk children at the party; or 4) their sexual assaults would not have occurred had the chaperone done more than simply walk away from the kids engaging in oral sex in the bathroom.

The same evidence also presents a fact-finder with a question of fact regarding whether the assaults would have occurred had Junior been sober and Debbie not simply walked away from the events transpiring in the bathroom given the escalating nature of the conduct. She had undertaken the role of chaperone and undertaken the effort to control both conduct in general and conduct of a sexual nature. Nothing was done to control the escalating events, though, when her initial effort was met with noncompliance. Despite previously realizing that circumstances were growing so crazy that she needed help to control the party, the chaperone walked away, allowed the party to continue, let Alvin stay, and did nothing else as everyone merely laughed at the fact of children engaging in sex.

18

In short, the summary judgment record contained some evidence creating a material issue of fact concerning whether Debbie failed to exercise reasonable care after assuming control of the kids and that her failure proximately caused Irsia's eventual injuries.

That the events began with inappropriate behavior between children on a couch and turned into oral sex in a bathroom are also important bits of evidence serving to distinguish the situation at bar from those in an opinion upon which Dad and his children place much reliance, *Doe v. Messina*, 349 S.W.3d 797 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). The *Messina* court had before it circumstances involving teenagers having a party, drinking alcohol, and ingesting drugs at a house. *Id.* at 799. Eventually, the party ended, and the attendees went to sleep. *Id.* One of the female attendees (Doe) was later awakened by another guest (Kervin) who proceeded to rape her, and the victim sued the homeowner for negligence and premises liability. *Id.* Like Dad and the others here, the homeowner in *Messina* attacked causation by interjecting Kervin's criminal conduct. *Id.* at 800. Summary judgment was entered against Doe and subsequently affirmed on appeal. *See id.* at 799. In deciding to affirm, the reviewing court conceded that teenagers consuming alcohol without adult supervision could lead to foreseeable consequences such as "promiscuity." *Id.* at 803. Yet, it concluded that the act of rape was "an *extraordinary* consequence." *Id.* The court's decision, however, must be placed in context. Doe seemed to be arguing that rape was a foreseeable consequence of the mere ingestion of drugs

19

and alcohol by a group of young people at a party. *Id.* at 802–03 (stating that "we will determine whether Doe's sexual assault was the foreseeable consequence of appellees' alleged failure to supervise a group of teenagers who were consuming alcohol"). The appellate court disagreed because, among other things, there was no evidence that the assault happened due to the victim's drunken state. *Id.* at 804.

Here, Irsia testified, via deposition, about 1) being "very, very incoherent" at the time of the assaults, 2) running outside and stumbling, 3) Alvin following her outside, 4) Alvin "bugging" and "trying to kiss" her, 5) her "falling all over the place" and eventually falling to the ground, 6) Alvin removing her pants, 7) Alvin "kind of . . . pushing [her] head to give him oral sex" 8) "being drunk and [so] intoxicated" that she did not exactly remember what Alvin and Ivan spoke about after Ivan appeared at Alvin's side, and 9) both Alvin and Ivan trying to force her to perform oral sex as she tried to get up from the ground while incoherent. It must not be forgotten that by the time she was on the ground outside, she and another boy had already engaged in inappropriate behavior on a couch while drunk. This is some evidence indicating that the victim's drunken state played a role in the assaults, unlike the circumstances in *Messina*.

We also have evidence of an eventual assailant engaging in sexual activity in a bathroom, activity which the chaperone knew of and considered disgusting. Such was missing in *Messina,* as was evidence that the kids at the gathering

viewed sexual activity with nonchalance and laughter or that the person who opted to supervise the drunk kids viewed parties as a place to "hook up."

Simply put, the evidence underlying the decision in *Messina* differs greatly from that here. And, the evidence present here but absent in *Messina* could reasonably support a fact-finder's conclusion that sexual assault at the gathering was not necessarily an extraordinary consequence.

The same can be said of another opinion upon which Dad, Debbie, and Junior relied, *Spears v. Coffee*, 153 S.W.3d 103 (Tex. App.—San Antonio 2004, no pet.). It involved a physical altercation between minors at the Coffee home. *Id.* at 105. Spears sued the Coffees for negligently supervising the group. In affirming the summary judgment upon the claim of superseding cause, the reviewing court noted 1) Spears's admission that "prior to the incident, Michael and Billy had not been involved in any physical confrontation"; 2) "Mrs. Coffee['s] state[ment] that nothing like this incident had ever before occurred in her home"; and 3) her daughter's statement that though Billy seemed aggravated upon arriving at the house on the day of the incident, "he 'got fine' within a few minutes." *Id.* at 107. Here, there is evidence of sexual activity at the party progressing from displays of inappropriate conduct on a couch to oral sex in a bathroom and, ultimately, to rape in the front yard. Moreover, all knew, including the chaperone, that Alvin was a participant in the bathroom episode. This evidence tends to render *Spears* quite distinguishable.

21

Missing from the record at bar, though, is evidence that Dad knew or approved of the party before leaving to visit his eldest daughter at college. Again, Junior planned the gathering without anyone knowing until guests began to arrive. He, not Dad or Debbie, determined who to invite and anticipated that they would bring alcohol. And, while there is evidence that Dad eventually became aware of the venture, that did not occur until hours after it had begun and participants were leaving. Nothing of record suggests he approved of it after being contacted by an attendee's mother, knew the identities of those attending the event, or knew about the sexual activities in which various attendees engaged. The absence of this evidence leads us to find the observation and holding in *Messina* applicable as to him. Belatedly discovering that his children hosted an event involving minors wherein alcohol was present is, alone, not a basis upon which a rational fact-finder could reasonably deduce that sexual assault was a foreseeable consequence of the event from Dad's viewpoint. From his perspective and vis-a-vis any potential negligent act he may have committed, the criminal conduct of Alvin, Ivan, and Joe was a superseding cause of Irsia's injuries, and Irsia presented no evidence creating a material fact on the issue.

In sum, the evidence of record creates material issues of fact regarding both proximate and superseding cause. That is true only with regard to the negligence claims asserted against Debbie and Junior. Thus, the trial court did not err in granting Dad summary judgment.

We reverse the trial court's summary judgment denying Irsia recovery upon her claim of negligence asserted against Debbie and Junior and remand the cause to the trial court for further proceedings as to Debbie and Junior. *See Williams v. Lavender*, 797 S.W.2d 410, 412 (Tex. App.—Fort Worth 1990, writ. denied) (recognizing the general rule that, in Texas, minors are severally liable for their own torts). In all other things, the summary judgment is affirmed.

/s/ Brian Quinn

BRIAN QUINN
CHIEF JUSTICE

PANEL: SUDDERTH, C.J.; MEIER, J.; and QUINN, C.J. (Sitting by Assignment).

SUDDERTH, C.J., and MEIER, J., concur without opinion.

DELIVERED: July 19, 2018